UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


KENNETH KIMBALL          )
           )
v.            )     No.  3:10-0730
           )     JUDGE CAMPBELL
UNITED STATES OF AMERICA    )


## MEMORANDUM

### I. Introduction

Pending before the Court is a Motion To Vacate, Set Aside, Or Correct Conviction And Sentence Under 28 U.S.C. § 2255 (Docket No. 1), filed by the Movant/Petitioner (hereinafter "Petitioner"). The Petitioner has filed a brief in support of the Motion (Docket No. 39), and the Government has filed responses to the Motion. (Docket Nos. 13, 45).

For the reasons set forth below, the Court concludes that Petitioner's Motion To Vacate is DENIED, and this action is DISMISSED.

### II. Procedural and Factual Background

In the underlying criminal case, the Petitioner was charged with conspiracy to distribute and possess with intent to distribute 50 kilograms or more of marijuana and 100 grams or more of methamphetamine, in violation of 21 U.S.C. § 846 (Count One); conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (Count Two); conspiracy to import five kilograms or more of cocaine, in violation of 21 U.S.C. § 963 (Count Three); four counts of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Counts Four, Seven, Eight, Twelve); distribution and possession with intent to distribute five kilograms or more of cocaine within 1000 feet of a school or college, in

violation of 21 U.S.C. §§ 841(a)(1), 856, and 860 (Count Five); possession of a firearm in

furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Six);

conducting a financial transaction to conceal unlawful activity, in violation of 18 U.S.C. §

1956(a)(1)(B)(i) (Count Nine); possession with intent to distribute five kilograms or more of

cocaine within 1000 feet of a school, in violation of 21 U.S.C. §§ 841(a)(1) and 860 (Count

Thirteen); conducting a financial transaction involving unlawful activity, in violation of 18

U.S.C. § 1956(a)(1)(A)(i) (Count Fourteen); attempt to possess with intent to distribute five

kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (Count Fifteen); solicitation to

commit murder, in violation of 18 U.S.C. § 373 (Count Sixteen); possession of destructive

device and silencer in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)

(Count Seventeen); transfer of explosive materials for use in a crime of violence, in violation of

18 U.S.C. § 844(o) (Count Eighteen); possession of a destructive device and firearm silencer, in

violation of 26 U.S.C. § 5861(b) (Counts Nineteen and Twenty); obstruction of justice, in

violation of 18 U.S.C. § 1503 (Count Twenty-Three); and witness tampering, in violation of 18

U.S.C. § 1512(b) (Count Twenty-Four). (Docket No. 338 in Case No. 3:02-00053).

Co-Defendant John Weston pled guilty prior to trial; Co-Defendant Debra Moses was

placed on Pretrial Diversion; and Co-Defendants Jimmy Ray Patterson and Amilcar Butler were

severed for separate trial. (Docket Nos. 67, 291, 292, 347 in Case No. 3:02-00053). Co-

Defendants Randall R. Parker and Steve Corlew proceeded to trial with the Petitioner.

At the conclusion of a three-week trial involving over 80 witnesses, the jury convicted

the Petitioner on all counts, and granted forfeiture in the amount of $30,000,000. (Docket Nos.

388, 395, 399 in Case No. 3:02-00053).  Trial counsel filed motions for new trial and for

judgment of acquittal, which were denied by the Court. (Docket Nos. 403, 509, 522). The Court subsequently sentenced the Petitioner to two consecutive life sentences plus 15 years. (Docket Nos. 539, 540 in Case No. 3:02-00053).

On appeal of Petitioner's conviction and sentence, the Sixth Circuit affirmed the conviction, but vacated and remanded the sentence for reconsideration in light of United States v. Booker, 543 U.S. 220 (2005), which was issued after the Court imposed sentence. (Docket No. 684 in Case No. 3:02-00053; United States v. Kenneth Kimball, et al., 194 Fed. Appx. 373, 2006 WL 2571951 (6th Cir. Sept. 8, 2006)), cert. denied, 127 S.Ct. 1137 (Jan. 16, 2007)). On remand, the Court applied the decision in Booker, but ultimately imposed the same sentence it had imposed prior to remand. (Docket Nos. 736, 737 in Case No. 3:02-00053). On appeal of the Amended Judgment, the Sixth Circuit affirmed. (Docket Nos. 739, 770 in Case No. 3:02-00053; United States v. Randall R. Parker and Kenneth Kimball, 341 Fed. Appx. 122, 2009 WL 2413149 (6th Cir. Aug. 7, 2009)).

In its first decision, the Sixth Circuit presented the relevant facts as follows:

*Drug Charges*

Beginning in 1999, Kimball was the head of a drug trafficking operation. He paid others, Corlew included, to import drugs into Nashville from Texas and New Mexico, and then distributed them through Parker and others.

One of Kimball's suppliers in Texas, Russell Bourjaily, sold Kimball's couriers-John Weston and Jimmy Patterson-hundreds of kilograms of cocaine over a one-year period. Patterson and Weston made approximately 10 trips, carrying hundreds of thousands of dollars in cash to El Paso and purchasing around four hundred kilos of cocaine at a time. Margaret Harper, Kimball's assistant and mistress, helped procure the large amounts of cash to pay suppliers. Patterson and Weston usually delivered the contraband to K & K's Auto Service, one of Kimball's businesses in Nashville. Parker served as one of Kimball's principal distributors.

3

In December 2000, Patterson and Weston drove to El Paso with $ 592,000 in cash to purchase cocaine from Bourjaily. On their way back to Nashville they were stopped at a checkpoint where officers seized approximately 40 kilograms of cocaine and records of other drug purchases.

*Solicitation of Violence*

Patterson told Weston that Kimball had sent unidentified persons to kill Bourjaily, whom Kimball suspected was behind the arrest. Kimball instructed Alva Lock to kill Bourjaily and provided him with a bomb which Lock kept stored in a locker and kept the detonator in his car. Kimball also gave Lock a Bersa handgun and a silencer. In August 2001, the police found the Bersa and the detonator in Lock's car. In May 2002, the bomb was found in the storage locker when it was opened after the contents were auctioned off for non-payment.

In August 2001, Eric Boyd identified Kimball as having supplied him with several kilos of cocaine. When other informants corroborated the fact that Kimball was a drug supplier in the Nashville area, a confidential informant contacted Patterson and recorded their meetings. During one such meeting, Patterson discussed a drug deal with Parker. These calls made Kimball and Parker erroneously suspect Patterson of cooperating with the police. Harper overheard Kimball and Parker agree that Patterson and Weston should both be killed. Kimball contacted James Bass and asked him to find someone who would do the deed for $ 10,000. Bass in turn contacted Marcel Boyd and Terrell Polk. Parker, Bass, Boyd and Polk met at Parker's business where Parker increased the fee to $ 15,000 to commit the murders and asked whether they could find other triggermen.

In 2002, the government contacted Kimball as part of a Nashville-based investigation. Kimball told Lock he was being investigated by the IRS, and that he had surrendered $ 118,000 in cash. Kimball then became concerned that Parker might testify against him, and asked Lock to kill Parker in addition to Bourjaily. Kimball also promised to pay off Lock's $ 115,000 mortgage. Lock ultimately failed to carry out his plan to kill Parker and Bourjaily.

*Money Laundering*

Kimball purchased 'Frank's Auto Salvage' with cash, and used the business as a way to disguise the cash proceeds from the drug sales through structured transactions, and by falsifying sales of parts and scrap. Additionally, Parker paid cash for a Cadillac at a Nashville auto auction. Parker contacted Kimball and asked him to prepare false documents showing that Parker's sister, Debra Moses, purchased the vehicle from Kimball's used car lot, Tank's Auto Sales.

4

United States v. Kimball, 194 Fed.Appx. at 375-376.

III. <u>Analysis</u>

A. <u>The Petitioner's Claims</u>

Petitioner contends that his conviction should be vacated because he received the ineffective assistance of counsel at trial and on appeal, and because the Government engaged in prosecutorial misconduct.

B. <u>The Section 2255 Remedy/Evidentiary Hearing Not Required.</u>

Section 2255 provides federal prisoners with a statutory mechanism by which to seek to have their sentence vacated, set aside or corrected.[1] The statute does not provide a remedy, however, for every error that may have been made in the proceedings leading to conviction. The statute contemplates constitutional errors, and violations of federal law when the error qualifies as a "fundamental defect which inherently results in a complete miscarriage of justice." <u>Reed v. Faley</u>, 512 U.S. 339, 114 S.Ct. 2291, 2296, 2299-2300, 129 L.Ed.2d 277 (1994); <u>Grant v. United States</u>, 72 F.3d 503, 505-06 (6th Cir. 1996).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that the Court shall consider the "files, records, transcripts, and correspondence relating to the judgment under

---

[1] 28 U.S.C. § 2255 states, in part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

5

attack" in ruling on a petition or motion filed under Section 2255. In addition, where the same judge considering the Section 2255 motion also presided over the underlying criminal proceedings, the judge may rely on his own recollection of those proceedings. Blackledge v. Allison, 431 U.S. 63, 97 S.Ct. 1621, 1629 n. 4, 52 L.Ed.2d 136 (1977); Blanton v. United States, 94 F.3d 227, 235 (6th Cir. 1996).

An evidentiary hearing is not required if the record conclusively shows that the Petitioner is not entitled to relief. 28 U.S.C. § 2255; Rule 8 of the Rules Governing Section 2255 Proceedings For The United States District Courts; Arredondo v. United States, 178 F.3d 778, 782 (6th Cir. 1999). No hearing is required "if the petitioner's allegations 'cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" Id. (quoting Engelen v. United States, 68 F.3d 238, 240 (8th Cir. 1995)).

The Court has reviewed the files, records, transcripts and correspondence filed in Petitioner's underlying criminal case, as well as the pleadings, briefs, and exhibits filed by the parties in this case.  The Court finds it unnecessary to hold an evidentiary hearing because these records conclusively establish that Petitioner is not entitled to relief on the issues raised.

C. Ineffective Assistance of Counsel

In order to prevail on an ineffective assistance of counsel claim, the burden is on the Petitioner to show: (1) trial counsel's performance was not within the range of competence demanded of attorneys in criminal cases; and (2) actual prejudice resulted from the deficient performance.  Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); Cullen v. Pinholster, 131 S.Ct. 1388, 1403 (2011); Campbell v. United States, 364 F.3d 727, 730 (6th Cir. 2004).

6

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." Strickland, 104 S.Ct. at 2052; Ludwig v. United States, 162 F.3d 456, 458 (6th Cir. 1998). In analyzing trial counsel's performance, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id., at 2065. Cullen, 131 S.Ct. at 1403.

In proving prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.; Cullen, 131 S.Ct. at 1403.

As the Supreme Court has explained, a court need not determine whether counsel's performance was deficient before examining whether prejudice resulted from the alleged deficiencies. Strickland, 466 S.Ct. at 697; Ivory v. Jackson, 509 F.3d 284, 294 (6th Cir. 2007). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

1. Failure to investigate and present defense

a. Witnesses Lock, Emry and Harper

Petitioner argues that trial counsel, Roger "Bo" Taylor and Mark Scruggs, failed to conduct an adequate investigation in preparing a defense. Specifically, Petitioner alleges that counsel conducted no interviews or investigation of any of the Government's witnesses. More specifically, Petitioner alleges that counsel failed to investigate or interview Alva Lock, Michael Ray Emry, and Margaret Harper, whom he describes as "the key government witnesses on the

7

counts of the Third Superseding Indictment carrying the greatest statutory punishment." (Motion To Vacate, at 5 (Docket No. 1)). Petitioner contends that there was substantial impeachment that went unexplored on cross examination due to the failure to investigate.

With regard to Ms. Harper, Petitioner states in an affidavit that he was surprised by counsel's cross examination of Ms. Harper suggesting that he was having an affair with her, and did not agree to this "tactic" used by defense counsel. (Affidavit of Kenneth Kimball, at ¶ 8 (Docket No. 39-1)). The Petitioner states that he preferred that counsel show Ms. Harper's testimony about their affair was a fantasy.[2] Petitioner contends that counsel should have asked Ms. Harper about a statement made to the Government in a proffer that she was a lesbian "who had not been romantic with the opposite sex since her divorce in the 1980's" (though Petitioner has not filed that proffer statement with the Court). (Id.) Petitioner also states that he told his attorneys he had refused Ms. Harper's request for $10,000 prior to trial, and that they could have discredited her with this information. (Id.) The Petitioner states that if counsel had interviewed Ms. Harper "she would have realized that her motives to lie and prejudice would be exposed, and therefore, she would have been more inclined to be truthful at trial instead of lying like she did." (Id.)

Petitioner also points out that he has received letters from Ms. Harper's son (Ms. Harper apparently died in 2007) indicating that she deeply regretted testifying against the Petitioner, and that allege the prosecution told Ms. Harper that the Petitioner would try to kill her children. (Id.)

The Court concludes that Petitioner has failed to show trial counsel was ineffective with

---

[2] The Court notes that this statement conflicts with the Petitioner's proffer statement of January 17, 2003, in which he states that Margaret Harper was his mistress. (Docket No. 284 in Case No. 3:02-00053, at Exhibit 2).

8

regard to Ms. Harper. Petitioner's allegation that trial counsel was defective in failing to interview Ms. Harper fails because Petitioner has not shown that Ms. Harper would have agreed to such an interview. Nor has Petitioner shown that the interview itself would have persuaded Ms. Harper to testify more favorably.

As for trial counsel's cross examination of Ms. Harper, the record of the trial indicates that counsel cross examined Ms. Harper about her illicit fifteen-year affair with the Petitioner, and suggested she was motivated to lie by Petitioner's refusal to leave his wife for her. (Trial Transcript, at 700-09 (Docket No. 553 in Case No. 3:02-00053)). Trial counsel explored Ms. Harper's cooperation agreement with the Government, her receipt of illegal food stamps and failure to pay taxes, her mental disorders, and the effect her medication for mental illness had on her memory. (Id.) Trial counsel also elicited favorable testimony from Ms. Harper pointing out that she never saw cocaine at the Petitioner's business, and suggesting that Petitioner's business relationships with alleged co-conspirators were legitimate. (Id., at 694-700, 703).

Petitioner implicitly admits in his affidavit that counsel's decision to use the end of the alleged affair as a motive for lying was a "tactic" to impeach Ms. Harper's credibility. The choice of such a tactic does not indicate that trial counsel was ineffective. In any event, Petitioner has failed to show that the cross examination topics he suggests would have been more effective in undermining the credibility of Ms. Harper than the topics covered by trial counsel, or when added to the topics covered, likely would have resulted in a more favorable outcome.[3]

---

[3] The Court notes that Mr. Harper's unsworn letters to the Petitioner, even if considered as competent evidence, do not call into doubt Ms. Harper's testimony at trial. First, despite the Petitioner's characterization of the letters, they do not state that Ms. Harper lied during her testimony at trial. (Docket No. 39-1, at 11-14 of 18). Furthermore, even if the Court accepts as true the suggestion that the prosecutor told Ms. Harper the Petitioner would try and kill her

9

Petitioner also contends that trial counsel should have interviewed Mr. Lock. In his affidavit, the Petitioner states that following his arrest, the prosecution insisted that the Petitioner terminate Mr. Lock's employment at his used car business because he was stealing vehicles, and that the prosecution thereafter recruited Mr. Lock to be a Government witness. (Docket No. 39-1, at ¶ 9). Petitioner claims that trial counsel was aware of this information, and never used it to his advantage at trial. (Id.)

Petitioner's allegation that trial counsel was defective in failing to interview Mr. Lock fails because, as with Ms. Harper, he has not shown that Mr. Lock would have agreed to such an interview. Nor has he shown that the interview itself would have persuaded Ms. Lock to testify more favorably.

As for trial counsel's cross examination of Mr. Lock, the record of the trial indicates that trial counsel asked Mr. Lock about his extensive criminal history, an angry letter he wrote to the Petitioner, his efforts to carry on the Petitioner's business after the Petitioner's arrest, his favorable plea agreement, and his lack of candor in interviews with Government agents. (Trial Transcript, at 1928-66 (Docket No. 558 in Case No. 3:02-00053)). Petitioner has failed to show that the cross examination topics he suggests would have been more effective in undermining the credibility of Mr. Lock than the topics covered by trial counsel, or when added to the topics covered, likely would have resulted in a more favorable outcome.

Finally, Petitioner contends that trial counsel should have interviewed Mr. Emry. As with the other witnesses, Petitioner has not shown that Mr. Emry would have agreed to be

---

children, it is unlikely such a statement would have made Ms. Harper more willing to testify *against* the Petitioner.

interviewed prior to the trial, or that such an interview likely would have resulted in more favorable testimony. Trial counsel cross examined Mr. Emry about his prior inconsistent statements to law enforcement and grand jury testimony, his extreme political views, mental health treatment, his illegal building of machine guns, and the lengthy sentence he faced if he refused to cooperate. (Trial Transcript, at 1811-38 (Docket No. 558 in Case No. 3:02-00053)). Petitioner does not suggest an area of inquiry that trial counsel failed to address that likely would have resulted in a more favorable outcome.[4]

> b. Failures related to the explosive device and silencer

Petitioner argues that trial counsel failed to inspect the functionality of the purported explosive device and the silencer admitted as exhibits as trial. Petitioner contends that counsel should have retained an expert on firearms and explosives to examine these items of evidence.

In his affidavit, Petitioner states that he urged trial counsel to hire an expert to determine whether the purported bomb actually had the capability to explode since it lacked a detonator. (Docket No. 39-1, at ¶ 5). Petitioner also states that he expressed concern that the silencer appeared to be a lawn mower muffler, and that the threading on the silencer made it a poor fit with the pistol. (Id., at ¶ 6). Petitioner states that he provided funds for such expert services.

_____

[4] The Government has filed the affidavit of Mr. Scruggs, who along with Mr. Taylor, represented the Petitioner at trial. (Docket No. 13-1). According to Mr. Scruggs, either defense counsel or their investigator, Roger Clemons, interviewed Mr. Lock and Ms. Harper, but when "it became apparent that they were involved in the conspiracy that Kimball was charged with, they became witnesses for the government and were represented by their own counsel." (Docket No. 13-1, at 1 of 4). As for Mr. Emry, Mr. Scruggs states that the defense team did not interview him because they did not know he would be a Government witness until at or near the time of trial. (Id.)

Given the Court's rejection of Petitioner's claims as set forth above, however, it is unnecessary to consider the affidavit of Mr. Scruggs.

(Id.)  Petitioner has not provided any proof, however, as to the specific testimony or assistance that such an expert would offer.

At trial, the Government called Senior Special Agent Mark Hoback of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), who is also a certified explosives specialist, to testify regarding the alleged bomb and silencer. (Trial Transcript, at 1668-99 (Docket No. 557 in Case No. 3:02-00053)).  Agent Hoback testified about the one and one-quarter pound block of military C-4 explosive material and other items found in Mr. Lock's storage unit, and demonstrated the explosive effects of the block of C-4 through a video and pictures shown to the jury. (Id., at 1668-94.  Agent Hoback also testified about the Bersa semiautomatic pistol and silencer, and that the threading on the silencer fit into threading on the barrel of the pistol. (Id., at 1695-99).

Christopher L. Brady, an ATF firearms enforcement officer, testified that the silencer reduced the sound of the report of the firearm by approximately 18 to 19 decibels, which he characterized as "a relatively good silencer." (Trial Transcript, at 1724-27 (Docket No. 558 in Case No. 3:02-00053)).  Agent Brady also opined that the device constituted a "silencer" under federal law. (Id., at 1728).

Laurie Krupa, a forensic chemist with the ATF, testified that her testing of the explosive material referenced by Agent Hoback indicated that it was C-4, a high explosive material. (Id., at 1732-35).  Ms. Krupa opined that the material constituted an "explosive" under federal law. (Id.)

As the Court instructed the jury, the definition of "destructive device" under 18 U.S.C. § 921(a)(4) and 26 U.S.C. § 5845(f) includes "any explosive" or "any combination of parts either

12

designed or intended for use in converting any device into any destructive device. . ." (Trial Transcript, at 2407, 2413 (Docket No. 560 in Case No. 3:02-00053)). As the Court also instructed the jury, the term "firearm silencer" under 18 U.S.C. § 921(a)(24) means "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or muffler, and any part intended only for use in such assembly or fabrication." (Id., at 2406-07).

In order to demonstrate that trial counsel was deficient in failing to call a witness, or that the Petitioner was prejudiced by the failure to call a witness, the Petitioner must, at a minimum, indicate the substance of the proposed testimony and the availability of the witness to testify. See Rayner v. Mills, 685 F.3d 631, 641 (6th Cir. 2012)(Petitioner could not prove prejudice prong of ineffective assistance claim that trial counsel should have called co-worker without providing potential testimony of co-worker); Malcum v. Burt, 276 F.Supp.2d 664, 679-80 (E.D. Mich. 2003)(Petitioner's claim that trial counsel was ineffective in failing to call alibi witnesses is not established in absence of proof regarding identity of witnesses and substance of their potential testimony); Talley v. United States, 2006 WL 3422997, at *9-10 (E.D. Tenn. Nov. 27, 2006).

The Petitioner has provided no evidence indicating that trial counsel would have been able to retain an expert who would reach opinions contrary to those given by the Government's witnesses. Nor has Petitioner explained the type of assistance, other than testimony, that an expert would have provided. As for Petitioner's specific concerns, Petitioner has also failed to demonstrate that the absence of a detonator would undermine the Government's ability to prove the C-4 was a "component part" of a destructive device. Nor has Petitioner established that the

13

failure of the silencer to fit the Bersa firearm would undermine the Government's ability to prove that the device was a "silencer" under federal law. Accordingly, the Court concludes that Petitioner has failed to demonstrate that trial counsel erred in failing to hire a firearms/explosives expert, or that he suffered any prejudice from such a failure.

### c. Failure to hire expert on suggestibility

Petitioner also argues that trial counsel should have employed Elizabeth Loftus, a psychologist and renowned expert on suggestibility and false memories of witnesses, both to rebut the Government's evidence, and to aid the defense in cross examining witnesses.

Petitioner has failed to provide any specific evidence, however, as to the testimony that would be offered by Ms. Loftus, or a description of the services she would have offered the defense in this case, nor has he explained why such testimony would have been admissible. See United States v. Smithers, 212 F.3d 306 (6th Cir. 2000)(Discussing analysis that should have been applied by district court in determining the admissibility of identification expert in bank robbery case in which eyewitness identification was pivotal); United States v. Libby, 461 F.Supp.2d 3 (D.D.C. 2006)(Expert testimony on faulty memory and reliability of eyewitness identification properly excluded because it would not be helpful to jury in case involving obstruction of justice, perjury, and making false statement). Accordingly, the Court concludes that Petitioner has failed to demonstrate that trial counsel erred in failing to hire Ms. Loftus, or that he suffered any prejudice from such a failure.

### d. Failure to investigate witness tampering and obstruction of justice

Petitioner contends that trial counsel conducted no independent investigation regarding the alleged witness tampering and obstruction of justice charges. Petitioner further argues that

14

counsel failed to explore his contention that Margaret Harper lied about her romantic involvement with him, and should have explored her sexual preferences to confirm that lie.

Petitioner has not identified the favorable evidence a more thorough investigation of these charges by trial counsel would have revealed. Thus, Petitioner has failed to demonstrate that trial counsel erred in failing to conduct such an investigation, or that he suffered any prejudice from such a failure.

For the reasons set forth above, Petitioner has also failed to establish ineffective assistance with regard to Ms. Harper.

e. Failure to investigate Petitioner's involvement with the silencer and explosive device and threats to witnesses

Petitioner contends that trial counsel failed to adequately investigate his insistence that he had no involvement with the silencer or explosive device, or of his denial of any threats to kill witnesses. Petitioner does not, however, specify the nature of the evidence a more thorough investigation would have revealed. Thus, Petitioner has failed to demonstrate that trial counsel erred in failing to conduct such an investigation, or that he suffered any prejudice from such a failure.

f. Failure to call witnesses

Petitioner argues that trial counsel failed to call certain witnesses in his defense. Specifically, Petitioner states in his affidavit that he asked defense counsel to make use of statements made by former Assistant United States Attorney Larry Moon that Alva Lock was dishonest and untrustworthy. (Docket No. 39-1, at ¶ 9). Petitioner also states that he told trial counsel to make use of Assistant United States Attorney Sonny Koshy's pretrial insistence that Mr. Lock was a liar and a thief. (Id.)

15

The Petitioner has not filed or provided references to the record regarding the statements made by Mr. Moon or Mr. Koshy. Nor has he established that such statements would have been admissible at trial. See, e.g., United States v. Whitmore, 359 F.3d 609, 616-18 (D.C. Cir. 2004)(Discussing the requirements for admission of testimony regarding another witness's reputation or opinion for truthfulness or untruthfulness under Fed. R. Evid. 608(a)). The Petitioner has also failed to establish that use of the alleged statements likely would have produced a more favorable outcome. Accordingly, the Petitioner has failed to establish that trial counsel provided ineffective assistance regarding the alleged statements of Mr. Moon and Mr. Koshy.

Petitioner also argues that trial counsel should have called former inmate Jerry Sherrill to testify about overhearing jailhouse witnesses conspiring to lie at Petitioner's trial to curry favor with the Government. In his affidavit, the Petitioner states that during an interview with trial counsel, Mr. Sherrill stated that he "overheard several jailhouse witnesses (Bass, Boyd and Patterson) conspiring to lie at my trial and that they were comparing and reconciling their stories." (Docket No. 39-1, at ¶ 10). The Petitioner states that trial counsel declined to call Mr. Sherrill as a witness at trial. (Id.)

Petitioner has also filed an affidavit of Jerry Sherrill, which states that he told trial counsel that he had:

> . . . witnessed and overheard witnesses conspiring to lie about Kenneth Kimball's conduct and how to reconcile their stories. These individuals, specifically James Bass, Jimmy Patterson and an individual with the last name of Boyd were fabricating testimony against Mr. Kimball in an effort to receive consideration from the government towards their pending charges.

(Docket No. 39-5). Mr. Sherrill also states that he told the Petitioner's trial counsel that he was

available and willing to testify. (Id.)

Mr. Sherrill's affidavit provides no other details, however, such as the date he allegedly overheard the witnesses conspiring, or the location, or the date he met with trial counsel.[5] Without more detail, Mr. Sherrill's affidavit is simply insufficient to establish that trial counsel was deficient in failing to call him as a witness.[6]

_____

[5]   Mr. Sherrill's affidavit, along with the Petitioner's affidavit, suggests that Mr. Sherrill overheard this conversation when he was incarcerated with Mr. Bass, Mr. Patterson, and an individual named Boyd. Based on the record in the underlying criminal case, and the record in Mr. Sherrill's criminal cases, however, trial counsel would have been remiss to accept Mr. Sherrill's testimony without further investigation.  The record indicates that Mr. Sherrill was detained in a drug trafficking case between December 18, 2000 until June 26, 2001, when he was released on conditions. (Docket Nos. 165, 790 in Case No. 2:00-00016). Mr. Sherrill was sentenced on September 30, 2003, and was incarcerated at a federal facility in Manchester, Kentucky on January 16, 2004. (Docket Nos. 100, 101, 103 in Case No. 2:01-00015).

Mr. Bass was arrested on December 10, 2001 in Owensboro, Kentucky, and had been incarcerated since that time until he testified on January 15, 2004. (Trial Transcript, at 1578-79 (Docket No. 557 in Case No. 3:02-000153); Docket Nos. 1-4 in Case No. 3:02-00133)).  Mr. Patterson was arrested on November 8, 2001, and incarcerated until he testified at trial on January 8, 2004. (Docket Nos. 7, 25 in Case No. 3:01-00166; Docket Nos. 29, 33 in Case No. 3:02-00053).  Marcel Boyd testified at trial that he was serving a state sentence, presumably in a state facility. (Trial Transcript, at 1061 (Docket No. 555 in Case No. 3:02-000153)).  Eric Boyd was arrested and detained between August 27, 2001 and August 31, 2001, when he was released on conditions. (Docket Nos. 2, 9 in Case No. 3:01-00146).  Mr. Boyd's bond was revoked and he was arrested again on October 4, 2001, and was thereafter incarcerated until he testified at trial on January 12, 2004. (Docket Nos. 19, 20, 22, 23 in Case No. 3:01-00146).

Based on the record, then, Mr. Sherrill could not have overheard the conversation during his incarceration in 2001 because Mr. Patterson, Mr. Bass and Eric Boyd had not been arrested, and Marcel Boyd was incarcerated in a state facility.  Therefore, before accepting Mr. Sherrill's testimony, trial counsel would have had to confirm, at a minimum, that Mr. Sherrill was housed at a local facility between September 30, 2003 until the trial began on January 5, 2004, and that he was being held in the same facility as Mr. Patterson, Mr. Bass, and presumably, Eric Boyd, during this period.

[6]   The Court notes that, in cross examining these witnesses, trial counsel explored the possibility that the witnesses had talked with each other. (Trial Transcript, at 468, 502 (Docket No. 552 in Case No. 3:02-00053); 797-98 (Docket No. 554 in Case No. 3:02-00053);1093-94, 1100-01 (Docket No. 555 in Case No. 3:02-00053); 1587-88 (Docket No. 557 in Case No. 3:02-

17

Even if the Court assumes that Mr. Sherrill's testimony would have assisted the defense, the Petitioner has not shown that the testimony meets the standard for prejudice because it does not undermine confidence in the outcome of the trial given the overwhelming weight of the evidence against the Petitioner. As noted above, over 80 witnesses were called by the Government during the three-week trial. Even if Mr. Sherrill had testified, the suggestion that Mr. Patterson, Mr. Bass, and either Mr. Boyd met together to reconcile their stories would do little to undermine their testimony given that each of them was involved in a different aspect of the Petitioner's drug trafficking operation and/or murder plot.[7]

Absent a showing of prejudice, the Court concludes that Petitioner has not established ineffective assistance of counsel regarding the potential testimony of Mr. Sherrill.

2. Failure to effectively litigate Petitioner's motion to sever

Petitioner argues that trial counsel failed to prepare an effective, written pretrial motion to sever the "attempted assassination counts" (Counts 16-20) from the other counts. Petitioner

00053)).

[7]      Mr. Patterson was a courier, who picked up cocaine for the Petitioner in Texas during the period from April, 2000 to December, 2000. (Trial Transcript, at 409-505, 417, 440 (Docket No. 552 in Case No. 3:02-00053)). Mr. Bass testified that the Petitioner supplied him with cocaine for resale beginning in June or July 2000. (Trial Transcript, at 1513-1632 (Docket No. 557 in Case No. 3:02-00053)). Mr. Bass also testified that, in 2001, at Mr. Parker's request, he recruited Marcel Boyd and Terrell Polk to carry out the plan to kill Mr. Patterson and Mr. Weston. (Id., at 1543-47). Marcel Boyd testified that he met Mr. Parker through Mr. Bass, and that he and Terrell Polk agreed to kill two men for Mr. Parker in August or September of 2001, but did not go through with the agreement. (Trial Transcript, at 1061-1103 (Docket No. 555 in Case No. 3:02-00053)). Finally, Eric Boyd testified that he had purchased cocaine for resale from the Petitioner during the period between January, 2000, and August, 2001. (Trial Transcript, at 768-821 (Docket No. 554 in Case No. 3:02-00053)).

also contends that counsel failed to renew the motion at the conclusion of the proof at trial, resulting in a waiver of appellate review of the severance issue.

Prior to jury selection, Petitioner's trial counsel moved to sever, for a separate trial, Counts Sixteen, Seventeen, Eighteen and Nineteen relating to the Petitioner's providing Mr. Lock with a bomb, firearm and silencer to kill Co-Defendant Bourjaily, and later, Co-Defendant Parker. (Docket No. 550 in Case No. 3:02-00053, at 5-31). Trial counsel argued that the Petitioner could not testify in his own defense on the attempted assassination counts in a joint trial because he would effectively have to admit guilt on the drug counts. (Id.) Counsel argued that, in a separate trial, Petitioner would testify that he was actually warning Mr. Parker that he was being targeted by the Government at the time the attempted assassination counts allege he was conspiring to kill Mr. Parker. (Id.) The Government opposed the motion to sever, and the Court denied the motion because it found there was no constitutional prejudice in trying the claims together. (Id.)

Trial counsel raised the severance issue again in the motion for new trial, and the Court denied the claim and the motion. (Docket Nos. 509, 522 in Case No. 3:02-00053). Petitioner raised the claim again on appeal, but the Sixth Circuit declined to consider it because the severance motion was not renewed at the conclusion of the proof at trial. United States v. Kimball, 194 Fed. Appx. at 376.

Although Petitioner contends that a more effective presentation and preservation of the severance argument would have likely resulted in a more favorable outcome, he does not support such a statement with any specific arguments, and the Court is not persuaded by such a contention.

19

Federal Rule of Criminal Procedure 14(a) provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

In order to establish that he is entitled to severance, a defendant must show compelling, specific, and actual prejudice from a court's refusal to grant the motion to sever. United States v. Saadey, 393 F.3d 669, 678 (6th Cir.2005). The defendant must prove that joinder would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence. Zafiro v. United States, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). When a defendant seeks a severance based on his desire to testify about fewer than all the charges, he must make "a convincing showing" that he has both "important testimony to give concerning one count and a strong need to refrain from testifying on the other." United States v. Bowker, 372 F.3d 365, 385 (6th Cir.2004), *vacated on other grounds*, 543 U.S. 1182 (2005)).

Apparently, Petitioner contends that the important testimony he needed to give on the attempted assassination counts was that he could not be guilty of those counts because at the time he was alleged to have been plotting to kill Mr. Parker, he was actually warning Mr. Parker that he was the target of an investigation. Had the Petitioner testified in either or both severed trials, however, his credibility would have been severely undermined by the inconsistent stories he told government agents in his numerous pretrial statements. Furthermore, the proof that the Petitioner wanted to elicit regarding his warning to Mr. Parker was established through the testimony of Mr. Lock:

Q. What did he [Kimball] tell you to tell Randy?

A. The last – the last thing, only thing I remember specifically at that point I was

20

> to tell Randy [Parker] to get away from the house that the agents were coming. Apparently they know where they are.

(Trial Transcript, at 1901 (Docket No. 558)). Mr. Lock testified that this occurred during the same time frame that the Petitioner was urging him to kill Mr. Parker. (Id.)

The Court also notes that the Petitioner's warning to Mr. Parker to avoid arrest and his urging Mr. Lock to kill Mr. Parker were not inconsistent actions. The motivation to kill Mr. Parker, according to Mr. Lock, was that: "Randy was the only person that could verify or corroborate. . . Randy was the person that could get him [Kimball] in trouble." (Id.) Under either scenario, Mr. Parker would be less likely to implicate the Petitioner.

Accordingly, the Petitioner has not made a "convincing showing" that he had important testimony to give on the attempted assassination counts, nor has he shown that he was otherwise was entitled to severance. Thus, trial counsel did not provide ineffective assistance regarding the motion to sever.

### 3. Failures related to Juror Cook

Petitioner contends that trial counsel failed to sufficiently question prospective Juror Cook to support a challenge for cause, and failed to use a peremptory challenge against him. According to the Petitioner, counsel overlooked the practice against back-striking in federal court, and as a result, Juror Cook remained on the jury.

The Petitioner also argues that Juror Cook was subject to external influence that was made known to trial counsel and they failed to take action. Petitioner argues that Juror Cook's presence on the jury disrupted the fairness of the trial and compromised the verdict.

The evidence filed by the Petitioner to support these allegations include his own affidavit, and affidavits of several relatives. The Petitioner states in his affidavit that he disliked Juror

Cook's Government affiliation as a post office employee, and was uncomfortable with his demeanor in court and his dependency on someone to drive him to court each day. (Docket No. 39-1, at ¶ 12). The Petitioner states that he conveyed his concerns about Juror Cook to trial counsel, and they assured him that they would seek to have him struck for cause, or would use a peremptory challenge to strike him. (Id.). According to the Petitioner, trial counsel did not tell him that the failure to strike Juror Cook was due to their own error. (Id.)

Petitioner has filed the affidavit of Christi Frost, his niece, who states that she observed Juror Cook's father sitting in the courtroom listening to things that happened outside the jury's presence. (Docket No. 39-8). Ms. Frost states that Juror Cook's father told her that he had been smoking with the jurors, had been in the jury room, and was upset that he had been kicked out of the jury room on one occasion. (Id.) Ms. Frost claims that Juror Cook's father told her during jury deliberations that the verdict would be guilty because he had already talked to his son about it. (Id.) Ms. Frost indicates that family members reported this conduct to trial counsel. (Id.)

Petitioner has also filed the affidavit of Louise Frost, his sister, who states that she heard Juror Cook's father complain about being kicked out of the jury room by security on more than one occasion. (Docket No. 39-2). Ms. Frost states that members of her family also overheard Juror Cook's father state that he already knew the verdict because his son was incapable of making the decision on his own, sought his advice, and that the jury would be finding the Petitioner guilty. (Id.) Ms. Frost indicates that she reported this conduct to trial counsel. (Id.)

Finally, Petitioner has filed the affidavit of Staci Kimball, his daughter, who states that Juror Cook's father told her, prior to the announcement of the verdict, that he knew the jury would be reaching a guilty verdict because his son had already told him. (Docket No. 39-3).

22

After the trial, Petitioner's trial counsel filed a motion for permission to interrogate jurors based on statements of spectators indicating that at least one of the jurors may have been influenced by a relative with whom he drove to court each day and who observed jury-out proceedings, as well as concerns about the extraordinary security precautions taken during the trial. (Docket No. 481 in Case No. 3:02-00053). In the Order denying the motion, the Court stated:

> Rule 606(b) of the Federal Rules of Evidence prohibits testimony by a juror on matters that took place during deliberations, the effect of anything on the juror's minds or emotions, and the mental process of any juror. Fed.R.Evid. 606(b); Logan, 250 F.3d at 379. The rule makes an exception, however, for extraneous prejudicial information improperly brought to the jury's attention and evidence concerning an outside influence brought to bear upon any juror. (Id.)

> The Defendant's general suggestion that security measures may have affected the jury falls squarely within Rule 606's prohibition against testimony regarding the mental processes of jurors and whether their minds or emotions were affected by anything that occurred during deliberations. As for the suggestion that 'jury-out information' was conveyed to a juror by a relative who observed jury-out proceedings, Defendant has provided nothing other than speculation or surmise to support the allegation that such information was actually conveyed. The Defendant's request is little more than a 'fishing expedition' in search of information with which to impeach the jury's verdict. . .

(Docket No. 492 in Case No. 3:02-00053).[8]

In order to establish that trial counsel were ineffective with regard to the failure to strike Juror Cook, and the failure to raise the issue of improper influence with the Court during the trial, Petitioner must demonstrate that in the absence of Juror Cook, there is a reasonable

---

[8] Trial counsel also filed motions for a judgment of acquittal after the trial (Docket Nos. 403, 509 in Case No. 3:02-00053) which raised a number of grounds, including the Court's regulation of courtroom security during the trial. The Court denied the motions (Docket No. 522 in Case No. 3:02-00053), and explained that "any discussions regarding security took place outside the presence of the jury, and any extra security measures were not apparent to the jury."

23

probability that the outcome of the trial would have been different. Petitioner has not made this showing.

First, the allegations about Juror Cook having a pro-Government mindset are simply speculation, and evidence to that effect, if it existed, would not be admissible under Rule 606(b). Furthermore, even with the filing of his own affidavit and those of his family members, Petitioner has yet to provide evidence to support his allegation that the jury was exposed to extraneous information about security from jury-out hearings or otherwise. As to the allegation that Juror Cook's father discussed the case with his son, the Petitioner has failed to provide an affidavit, made under oath, from Juror Cook's father to that effect, or similar proof. See, e.g., United States v. Frost, 125 F.3d 346, 376-381 (6th Cir. 1997)(Defendant must prove that the unauthorized contact created actual juror bias; the trial court should not presume that a contact was prejudicial). The Court is not persuaded that the Petitioner has satisfied the prejudice prong, or that an evidentiary hearing is warranted, based on hearsay statements purportedly made in an informal setting (not under oath) to relatives of the Petitioner during a trial that took place over eight years ago. Petitioner complains that trial counsel failed to provide evidence of jury misconduct, but he has also failed to provide such evidence. Petitioner has not established that trial or appellate counsel were ineffective with regard to Juror Cook.

4. Admission of evidence relating to severed counts

Petitioner argues that trial counsel improperly permitted admission of the following evidence at trial: (1) Evidence that the Petitioner and Co-Defendant Parker wanted to kill Co-Defendants Patterson and Weston, the drug couriers, because they feared that Patterson and Weston would inform on them; and (2) Evidence of an unsuccessful police pursuit of co-

24

conspirator Amilar Butler in which two kilograms of cocaine were thrown from a car.

Prior to trial, the Court severed the solicitation of murder charge against Co-Defendant Parker (Count Twenty-One), and severed Co-Defendant Butler, for separate trials. (Docket Nos. 347, 348, 349 in Case No. 3:02-00053). The Government subsequently advised counsel that it intended to introduce evidence underlying Count Twenty-One (the plan to kill drug couriers Patterson and Weston) at trial under Federal Rule of Evidence 404(b), and counsel for Mr. Parker and the Petitioner objected. (Docket No. 550 in Case No. 3:02-00053, at 31-32, 39-64). The Court permitted the Government to introduce the evidence under Rule 404(b) as spoliation evidence or evidence of consciousness of guilt. (Id., at 62-64).

As for the police pursuit of Amilcar Butler, trial counsel objected to introduction of the evidence after they received notice from the Government of its intention to introduce it. (Trial Transcript, at 1214-24 (Docket No. 556 in Case No. 3:02-00053)). The Government argued that the incident, which occurred on June 15, 2000 and involved Mr. Butler tossing two kilograms of cocaine from the car in the course of the chase, was part of the drug conspiracy charged in Count Two because the cocaine was supplied by the Petitioner. (Id.) The Court ruled that the evidence was admissible because it was within the scope of the charged conspiracy and not Rule 404(b) evidence. (Id., at 1219).

Appellate counsel challenged the admissibility of the murder plot evidence and the police chase evidence, but the Sixth Circuit rejected the claim because trial counsel did not contemporaneously object at trial. United States v. Kimball, 194 Fed. Appx. at 376-77.

Petitioner now argues that trial counsel's pretrial motions challenging the evidence as to the severed counts were inadequate. Petitioner contends that counsel also failed to lodge a

25

contemporaneous objection to the evidence at trial, resulting in a forfeiture of appellate review. Appellate counsel was ineffective, according to the Petitioner, for failing to argue for plain error review of the issue.

Petitioner does not, however, state the grounds upon which trial counsel and appellate counsel should have sought exclusion of the evidence. With regard to the murder plot evidence, the Sixth Circuit has held that "spoliation evidence, including evidence that defendant attempted to bribe and threaten a witness, is admissible to show consciousness of guilt" under Federal Rule of Evidence 404(b) unless the probative value of the evidence is "substantially outweighed by the danger of unfair prejudice" under Federal Rule of Evidence 403. United States v. Mendez-Ortiz, 810 F.2d 76, 79 (6th Cir. 1986). See also United States v. Poulsen, 655 F.3d 492, 508 (6th Cir. 2011); United States v. Manns, 277 Fed. Appx. 551, 558 (6th Cir. May 5, 2008)("Since Mendez-Ortiz, we have reiterated that spoliation evidence regarding the defendant's threats to witnesses is admissible."). Petitioner has not presented any argument that trial or appellate counsel should have made to exclude this evidence.

Similarly, Petitioner has failed to present any argument that trial or appellate counsel should have made to exclude the police chase evidence. Accordingly, this claim is without merit. 5. Failures relating to cooperation and proffer statement

Petitioner argues that trial counsel were ineffective for advocating that he cooperate with the Government, and failed to advise him of the consequences of engaging in proffer sessions with the Government. Petitioner contends that the prosecutor was hostile toward him during these proffer sessions and that counsel did not intervene. Petitioner contends that as a result of the proffers, he was unable to testify at trial, and that during trial, the Government referenced his

cooperation.

Petitioner also argues that trial counsel were ineffective for entering into a stipulation regarding the terms of admissibility of Petitioner's proffer statements, which resulted in counsel's "opening the door" to admissibility of the statements at trial. Thereafter, Petitioner contends, counsel failed to articulate a legal basis for excluding the evidence of Petitioner's cooperation, resulting in waiver of appellate review.

To support these arguments, Petitioner states in his affidavit:

> Prior to being indicted in this case, the agents and Mr. Koshy came to Tanks Auto Sales and confronted me in a very accusatory way. Mr. Taylor advised me to go talk to the government without even asking me what, if anything, I knew or could tell them. Our first proffer was in January 2002. Within the first 30 minutes of the proffer, things got very ugly when Mr. Koshy accused me of being a liar, raised his voice and became very hostile toward me. Mr. Taylor allowed Mr. Koshy to act in this unprofessional way without interrupting or attempting to maintain decorum in the room. Mr. Taylor allowed Mr. Koshy to talk and act this way toward me for an additional 6 hours before the proffer terminated. In January 2003, Mr. Taylor and Mr. Scruggs scheduled an appointment for me to sit down with the government yet again, but did not consult me in advance. They were well aware of Mr. Koshy's outward hatred of me and his prior conduct toward me. They knew that we could not have a productive discussion with Mr. Koshy. I did not know why I had been brought to the federal building that day until I saw my lawyers in the U.S. Marshal's lock-up. The proffer was again very hostile. Mr. Koshy threatened to prosecute my children, and neither of my attorneys cut off the discussion.

(Docket No. 39-1, at ¶ 13).

The record in this case indicates that the Petitioner's first encounter with the Government was an interview at his business by Customs Agents on December 12, 2000. (Attachment 2 to Docket No. 284 in Case No. 3:02-00053 (December 12, 2000 Report); Trial Transcript, at 153-57, 161 (Docket No. 551 in Case No. 3:02-00053)). The interview occurred the day after Texas authorities seized cocaine, marijuana and currency hidden in vehicles that were being hauled on

a tractor-trailer driven by Co-Defendants Weston and Patterson and owned by the Petitioner.
(Id.) During the interview, the Petitioner confirmed to agents that Mr. Weston and Mr. Patterson
were hauling three vehicles to sell to potential buyers in Texas as part of his automobile sales
business. (Id.) The Petitioner denied knowledge of the items seized from the vehicles. (Id.)
Customs agents requested that the Petitioner take a polygraph examination, but he said he would
not be able to do so that day because he had a dental appointment. (Id. (December 23, 2000
Report)).

On December 23, 2000, the Petitioner took the polygraph examination as requested by
Customs Agents, after waiving his Miranda rights and signing a polygraph consent form. (Id.)
The Petitioner confirmed his lack of involvement in the transportation of drugs from Texas, but
failed the polygraph examination. (Id.). The Petitioner then advised agents that he was not the
"ringleader" of a drug trafficking organization, but he did have knowledge about the
involvement of Mr. Weston and Mr. Patterson. (Id.) The Petitioner told agents that he wanted to
talk to an attorney before providing further details, and agreed to contact them when he obtained
one. (Id.)

On January 17, 2002, the Petitioner and his attorney, Bo Taylor, came to the Nashville
DEA office. (Id. (First January 17, 2002 Report)). According to the record, AUSA Koshy
explained the terms of the proffer agreement to the Petitioner at that time. (Id.) The proffer
agreement provides, among other things, that the Petitioner "agrees to make a complete and
truthful statement of his/her knowledge of the subject matter of the investigation." (Attachment 1
to Docket No. 284, at ¶ 2). The agreement further provides that "[n]o statement or other
information provided by you or your client during this proffer discussion will be used directly

28

against your client in the Government's case-in-chief in any criminal case so long as he/she told the truth. . ." (Id., at ¶ 3).  If the Petitioner failed to tell the truth, however, the agreement states that "the proffer may be used against your client as impeachment or rebuttal evidence. . ." or the proffer statements "may be used against him/her for any purpose." (Id., at ¶ 4).  Petitioner signed the proffer agreement on a line under the following statement: "I have read the information contained in this letter and understand and agree to the terms and conditions set forth herein." (Id.)

After agreeing to the terms of the proffer agreement, the record indicates that the Petitioner made controlled telephone calls to two individuals that were recorded by agents. (Id. (First January 17, 2002 Report)).  The Petitioner also identified an individual from a photo lineup. (Id. (Second January 17, 2002 Report)).  The record indicates that the information provided by the Petitioner at that interview consisted of nine single-spaced pages. (Id. (January 18, 2002 Report)).

Four days later, the record indicates that agents met with the Petitioner at his attorney's office, and Petitioner surrendered custody of a safe containing $118,200 in drug proceeds he had skimmed from his associates.  (Id. (First January 22, 2002 Report)).  Petitioner also provided agents with a recording he made of a conversation of himself and Co-Defendant Parker on January 19, 2002. (Id., (Second January 22, 2002 Report)).  On January 26, 2002, Petitioner recorded another conversation with Mr. Parker and provided the recording to agents. (Id. (January 26, 2002 Report)).

The record indicates that on March 4, 2002, the Petitioner, accompanied by Mr. Taylor, gave another statement to agents and Mr. Koshy at the DEA offices. (Id. (March 4, 2002

29

Report)). Petitioner gave another statement at the DEA offices on April 23, 2002 in a meeting that was not attended by Mr. Koshy. (Id. (April 23, 2002 Report)). This statement was subsequent to the arrest and indictment of Mr. Parker on March 21, 2002. (Docket No. 5 in Case No. 3:02-00053).

The record indicates that Petitioner, accompanied by Mr. Taylor, gave another statement to agents at the DEA office on May 15, 2002. (Id. (May 15, 2002 Report)). At this meeting, the Petitioner agreed to take a lie detector test regarding his financial position. (Id.). The Petitioner took the lie detector test on June 20, 2002 to verify that he had submitted a truthful financial affidavit listing all his assets and liabilities. (Id. (June 20, 2002 Report)). The results of the polygraph was "no opinion rendered," and the Petitioner declined to continue testing on the advice of his attorney. (Id.) The record indicates that, on August 19, 2002, the Petitioner, accompanied by Mr. Taylor, gave a four-page, single-spaced statement to agents and Mr. Koshy at the U.S. Attorney's office. (Id. (August 19, 2002 Report)).

The Petitioner was indicted on September 13, 2002, and subsequently detained. (Docket Nos. 69, 85 in Case No. 3:02-00053). The record indicates that on January 17, 2003, Petitioner, accompanied by Mr. Taylor and Mr. Scruggs, gave a seven-page, single-spaced statement to agents and Mr. Koshy at the U.S. Attorney's office. (Id. (January 17, 2003 Report)).

Prior to trial, the Government filed a motion seeking to admit the Petitioner's proffer statements. (Docket No. 284 in Case No. 3:02-00053). Attached to the motion were the proffer agreement and the above-referenced reports of Petitioner's statements and cooperation. (Attachments 1 and 2 to Docket No. 284 in Case No. 3:02-00053). The parties subsequently filed a Joint Position (Docket No. 337 in Case No. 3:02-00053) regarding admission of the

30

Petitioner's proffer statements. The filing provided as follows: (1) The Petitioner admits that he lied during the proffer sessions; (2) Mr. Taylor certifies that he erroneously advised the Petitioner that the proffer statements could not be used against him in the Government's case-in-chief contrary to the specific terms of the proffer agreement; (3) The Petitioner enters into a stipulation, that may or may not be admitted, that he falsely claimed he did not pay a bulk sum of money for purchase of Frank's Auto Salvage; (4) The Government agrees not to offer the Petitioner's proffer statements into evidence in its case-in-chief unless the defense "opens the door" as determined by the court, but such statements may be used in rebuttal or impeachment; and (5) The Petitioner waives any claim of ineffective assistance of counsel regarding Mr. Taylor's advice about the use of the Petitioner's proffer statements. (Id.) The filing was signed by the Petitioner, Mr. Taylor, Mr. Scruggs, and Mr. Koshy. (Id.)

During the trial, trial counsel objected to a portion of Alva Lock's testimony and requested a mistrial based on their contention that the testimony violated the terms of the Petitioner's proffer agreement. (Trial Transcript, at 1974-76, 1983-93, 2002-13 (Docket Nos. 558 and 559 in Case No. 3:02-00053)). Specifically, trial counsel argued that Lock's testimony that he cooperated with government agents at the request of the Petitioner violated the proffer agreement. (Id.). The Court denied the objection and request for mistrial, finding that any error was harmless in light of the abundant evidence that the Petitioner was involved in the dealing of controlled substances. (Id.)

Appellate counsel raised the same issue on appeal, and the appeals court stated that the trial court held that defense counsel "opened the door" to disclosure of information regarding the proffer agreement, and that counsel had not addressed that holding or why the disclosure

31

violated the proffer agreement. <u>Kimball</u>, 194 Fed. Appx., at 377.

Petitioner first argues that trial counsel should not have advised him to cooperate with the Government. The record indicates, however, that the initial decision to speak with government agents occurred on December 12, 2000 and December 23, 2000, before the Petitioner retained Mr. Taylor. At that time, the Petitioner denied knowledge of drug trafficking involving Mr. Weston and Mr. Patterson; a statement he admitted was false after failing a polygraph examination at the next meeting. Consequently, the Petitioner had already began speaking with, and lying to, government agents before receiving any advice from Mr. Taylor. Petitioner suggests that Mr. Taylor should have asked him "what, if anything, I knew or could tell [government agents]," and yet the record indicates he gave agents several multi-page statements.

In any event, the Petitioner has not shown that his attorney's advice that he should attempt to cooperate with the Government was deficient. Indeed, several of the Petitioner's Co-Defendants did just that, and received reduced sentences. The reason Petitioner's cooperation did not result in a reduced sentence was the Petitioner's repeated failures to make complete and truthful statements to the Government. The failure to provide truthful statements is also the reason Petitioner felt he was unable to testify during the trial. There is no proof that trial counsel urged Petitioner to lie, or that the decision to lie was otherwise the fault of trial counsel. The Court notes that the consequences for lying to government agents was fully explained in the proffer agreement, which the Petitioner signed.[9]

_____

[9] As for Mr. Taylor's alleged failure to advise the Petitioner that his statements could be used in the Government's case-in-chief if he was untruthful, any such failure was cured by the Joint Position entered into by the parties that kept the statements from the jury. Despite Petitioner's argument to the contrary, the Court concludes that trial counsel's advice to enter into the Joint Position resulted in a better outcome than the Petitioner could have obtained by simply

Any suggestion that Petitioner's cooperation failed due to the hostility of Mr. Koshy during a proffer meeting has not been established and is belied by the record. The first proffer meeting attended by Mr. Koshy occurred on January 17, 2002. Petitioner thereafter participated in two controlled telephone calls and a photo lineup; surrendered $118,200 in drug proceeds; made two recordings of conversations with Co-Defendant Parker; gave five more statements; and took another partial polygraph examination. Petitioner does not explain why he continued to cooperate after the initial meeting with Mr. Koshy if the hostility he expressed was so excessive.[10]

Petitioner also argues the Government breached the proffer agreement when it introduced testimony by Mr. Lock's that he cooperated with government agents at the request of the Petitioner. Petitioner contends that this information was admitted because trial counsel "opened the door" under the Joint Agreement of the parties. The Court is not persuaded, however, that this testimony was covered by the proffer agreement given that it did not come from the Petitioner. In any event, even if the testimony was admitted through the fault of trial counsel, it did not result in prejudice to the Petitioner. In light of the overwhelming evidence of the Petitioner's guilt, admission of Lock's testimony regarding cooperation was harmless.[11]

arguing that he had not breached the proffer agreement.

[10]  As for Petitioner's allegation that Mr. Koshy threatened to prosecute his children, Petitioner has not shown that such a prosecution would have been unwarranted. See United States v. Johnson, 351 F.3d 254, 260-63 (6th Cir. 2003)(In context of determining voluntariness of confession, court holds that police threat to arrest defendant's family member is not coercive if it could have been lawfully executed). Consequently, he has not shown that trial counsel were ineffective for failing to proceed against Mr. Koshy for such alleged threats.

[11]  Petitioner contends that he was prejudiced because the jury heard that he "trusted Alva Lock enough to request his third party cooperation with the government's investigation."

33

Finally, to the extent Petitioner contends that appellate counsel failed to appropriately raise the issue of Lock's testimony on appeal, he does not present the more effective arguments that counsel should have made. For these reasons, this claim is without merit.

6. Misleading Petitioner with assurances about the outcome

Petitioner contends that trial counsel misled him with assurances about the outcome of the case, and resisted attempts to terminate them. Petitioner and his sister state in their affidavits that, when they complained about the representation, trial counsel expressed confidence in the defense. (Docket Nos. 39-1, 39-2).

That the Petitioner was convicted, however, does not establish that trial counsel were deficient, or that their expressions of confidence were misleading. Furthermore, Petitioner has not established that different representation likely would have produced a more favorable outcome.

7. Failure to raise prosecutorial misconduct claims

Petitioner argues that trial counsel were ineffective because they failed to raise various prosecutorial misconduct claims. Petitioner specifically contends that counsel failed to pursue the Government's coercive tactics used against him and against certain witnesses.

To support his claim regarding coercive tactics directed at him and his family, the Petitioner states in his affidavit that AUSA Koshy was hostile to him, accused him of being a liar, and had a threatening and disrespectful attitude toward him and his family. (Docket No. 39-

---

(Docket No. 39, at 20). That the Petitioner trusted Mr. Lock was established through Lock's testimony that the Petitioner asked him to kill Co-Defendants Bourjaily and Parker. In light of this evidence, testimony regarding Petitioner's attempts to have Lock cooperate with the Government was not significant.

34

1, at ¶ 13). Petitioner states that he wanted trial counsel to tell the jury about Mr. Koshy's tactics and inappropriate conduct: "I strongly believed that had the jury known about his witness intimidation tactics and other misconduct coupled with Ms. Harper's efforts to get money from me, the collusion of jailed witnesses, and Mr. Lock's credibility issues as recognized by the prosecutors, the jury would have found me not guilty of the charges." (Id., at ¶ 14).

In her affidavit, the Petitioner's sister, Louise Frost, alleges that in a meeting with her, Mr. Koshy became angry and hostile, and raised his voice at her. (Docket No. 39-2, at ¶ 5). Ms. Frost further alleges that Mr. Koshy threatened to arrest the Petitioner's wife and son, take everything they had, and make sure the Petitioner was never free again. (Id.) Ms. Frost states that, after this meeting, she spoke with Petitioner's attorney, Mr. Taylor, and he advised her to stay away from Mr. Koshy, and she followed that advice. (Id.)

The Petitioner has not cited any authority indicating that the hostility described by him and his sister, which did not result in articulated prejudice to his defense, rises to the level of a prosecutorial misconduct claim. Thus, trial counsel were not ineffective for failing to raise such a claim. See, e.g., Ludwig v. United States, 162 F.3d at 458 (Counsel is not required to raise meritless arguments to avoid a charge of ineffective assistance of counsel). The Petitioner has also failed to show that complaining about Mr. Koshy in front of the jury likely would have led to a more favorable outcome. Accordingly, this claim is without merit.

The Petitioner also argues that Mr. Koshy intimidated and threatened witnesses Blainey Zachary and Richard Dady, and has submitted affidavits in support of these claims. Petitioner's sister, Ms. Frost, states that Mr. Zachary told her that Mr. Koshy threatened to charge him with perjury and obstruction of justice if he did not say what Mr. Koshy wanted him to say during

35

grand jury testimony. (Id., at ¶ 8). Ms. Frost claims that Mr. Zachary told her he lied during his testimony, and that he was afraid of Mr. Koshy. (Id.)

The Petitioner's daughter, Staci Kimball, states in her affidavit that Mr. Zachary also told her that he had no choice but to lie because Mr. Koshy threatened to take his kids away from him and have him arrested if he did not say what Mr. Koshy wanted to hear. (Docket No. 39-3).

The record indicates that on September 13, 2002, Mr. Zachary testified before the grand jury. (Trial Transcript, at 1365 (Docket No. 556 in Case No. 3:02-00053)). At that time, Mr. Zachary testified that the Petitioner asked him how to obtain marijuana, and that he gave the Petitioner's number to Co-Defendant Russell Bourjaily. (Id., at 1364-65). Mr. Zachary testified that, at a later time, he drove by the Petitioner's shop and saw some people, including the Petitioner, unloading what he believed were blocks of marijuana. (Id., at 1367-70). Mr. Zachary testified that he became scared, and left immediately. (Id.) Mr. Zachary also testified that he had obtained a pound of marijuana from the Petitioner for $800 or $900 in July or August of 2000. (Id., at 1370-74).

When he testified at trial on January 14, 2004, Mr. Zachary claimed not to remember most of this information due to alcohol-induced blackouts. (Id., at 1357-80). He testified that the Petitioner was "like a brother" to him. (Id., at 1371).

In order to prevail on a claim that the prosecution advanced perjured testimony, a petitioner must show that: (1) the prosecution presented false testimony; (2) the prosecution knew the testimony was false; and (3) the testimony was material. Akrawi v. Booker, 572 F.3d 252, 265 (6th Cir. 2009). The testimony must be "indisputably false" rather than "merely misleading." Id.

36

Applying this standard to Mr. Zachary's hearsay statements to Petitioner's family members that he lied in his grand jury testimony, the Court concludes that Petitioner has not demonstrated prosecutorial misconduct. First, the Petitioner has not established that Mr. Zachary's unsworn, hearsay statements to Petitioner's family members is true, and that his grand jury testimony was false. In that regard, the Court notes that the Petitioner's own statements to investigators corroborates Mr. Zachary's grand jury testimony. The record indicates that on January 18, 2002, the Petitioner told government agents that Mr. Zachary introduced him to Mr. Bourjaily, his drug supplier in Texas. (Attachment 2 to Docket No. 284 in Case No. 3:02-00053 (January 18, 2002 Report)). Petitioner provided the agents with Mr. Zachary's cell phone number, and indicated that he had spoken with Mr. Zachary that day. (Id.) On August 19, 2002, Petitioner repeated the statement that "Blainey" introduced him to Mr. Bourjaily. (Id. (August 19, 2002 Report)).

In addition, the Court is not persuaded that Mr. Zachary's trial testimony was material. During his trial testimony, Mr. Zachary essentially recanted his grand jury testimony, and claimed to have forgotten everything. Therefore, his credibility was substantially undermined, and in light of the overall weight of the other evidence against the Petitioner, the testimony was not materially prejudicial to the Petitioner.

Petitioner also contends that, aside from the presentation of false evidence, a prosecutor's actions in threatening or intimidating witnesses can constitute a due process violation. The cases cited by the Petitioner to support this argument, however, do not bear a resemblance to the facts offered here. See Webb v. Texas, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972)(Trial judge violated defendant's due process rights by gratuitously singling out sole defense witness for

lengthy admonition on dangers of perjury, including warning that the perjury sentence would be added to his present sentence and impair chances of parole, effectively persuading the witness not to testify); United States v. Morrison, 535 F.2d 223 (3rd Cir. 1976)(Prosecutor met with prospective defense witness and warned her that she could be prosecuted on a drug charge if she testified, and for perjury if she lied on the stand, after which she refused to answer more than thirty questions); United States v. Davis, 974 F.2d 182, 187 (D.C. Cir. 1992)(No violation of defendant's due process rights where prosecutor advised him about possibility of perjury prosecution and did not make badgering threats designed to quash significant testimony); United States v. Harlin, 539 F.2d 679, 681 (9th Cir. 1976)(No violation of due process where trial court asked counsel for co-defendant, as she contemplated taking the stand, if he had advised her of penalties of perjury; finding that the admonition was not threatening nor did it employ "coercive language indicating the court's expectation of perjury."); United States v. Pierce, 62 F.3d 818, 832 (6th Cir. 1995)(Government agents' hostility to defense's alibi witnesses during pre-testimony interviews did not violate due process where witnesses were still willing to testify, but were not called by the defense); United States v. Vavages, 151 F.3d 1185 (9th Cir. 1998)(Violation of due process where prosecutor threatened defense alibi witness with perjury prosecution and withdrawal of plea agreement in an unrelated case, and commented on defense's failure to present any adult alibi witnesses in closing); United States v. Golding, 168 F.3d 700 (4th Cir. 1999)(Prosecutor threatened a defense witness with prosecution in order to prevent her from testifying and then called attention to the witness's failure to testify in order to strengthen the Government's case in closing argument); United States v. Heller, 830 F.3d 150 (11th Cir. 1987)(Due process violation found where IRS agent admittedly coerced the defendant's

38

accountant to provide false testimony by informing him that, unless he testified, he would become a defendant himself).  The Petitioner has offered no evidence here that any witnesses were coerced into refusing to testify for the defense.

As Petitioner has failed to establish prosecutorial misconduct regarding Mr. Zachary's testimony, he was not prejudiced by trial counsel's failure to raise such a claim. See, e.g., Ludwig v. United States, 162 F.3d at 458 (Counsel is not required to raise meritless arguments to avoid a charge of ineffective assistance of counsel).

The Petitioner has also filed an affidavit of Richard Dady, who testified before the grand jury and at the Petitioner's trial. (Docket No. 39-4).  Mr. Dady states that at a meeting with government agents and Mr. Koshy several month after his grand jury testimony, he was repeatedly threatened by Mr. Koshy:

> Mr. Koshy told me that if I did not tell him what he wanted to hear that he would charge me with conspiracy to commit murder and conspiracy to distribute multiple kilograms of cocaine.  Mr. Koshy repeatedly threatened me that he could put me in jail for over twenty years and asked me what I thought it would be like to not see my kids for the next twenty years.  At one time I recall Mr. Koshy telling me that if I did not tell him what he needed to hear that he was going to have me arrested and he placed his hand on the telephone as if to call agents to come in and take me away.  Mr. Koshy consistently asked me to provide information about Ken Kimble's [sic] alleged drug trafficking.  He repeatedly stated that if I did not tell him what he wanted to hear, that he was going to have me arrested.  At the conclusion of the meeting Mr. Koshy told me that I needed an attorney because I was going to be charged with drug trafficking offenses.

(Id.)

At trial, Mr. Dady testified that he was the manager for Petitioner's car repair business in 2000, and hired Michael Emry to work there. (Trial Transcript, at 1753-1769 (Docket No. 558 in

Case No. 3:02-00053)).  According to Mr. Dady, Mr. Emry was a "gun freak," who worked on firearms.  (Id., at 1757).  He testified that Mr. Emry showed him a silencer that he said he purchased at a gun show. (Id., at 1759-60).  At a later time, Mr. Dady testified, Mr. Emry showed him some detonators that he said he used in C-4 explosives. (Id., at 1760-61).  Mr. Dady said he shared this information with the Petitioner. (Id., at 1761).

As with Mr. Zachary, the Court concludes that the Petitioner has not shown prosecutorial misconduct in connection with Mr. Dady's testimony.  First, the Petitioner has not shown that Mr. Dady's testimony was false.  Mr. Dady's own affidavit does not state that he lied when he testified.  Rather, he states that Mr. Koshy threatened to charge him as a co-conspirator if "I did not tell him what he wanted to hear."

In addition, the Court is not persuaded that Mr. Dady's trial testimony was material.  Michael Emry testified shortly after Mr. Dady, and said that the Petitioner asked him to make a bomb, and described to the jury in detail how he put the bomb together. (Id., at 1781-88).  Mr. Emry testified that he took the completed bomb to the Petitioner and explained the safety procedures, how it would work, and the damage it could cause. (Id., at 1790-93).  Mr. Emry also testified that he provided the Petitioner with a firearm and a silencer, and traded other firearms with him. (Id., at 1793-1800).  In light of Mr. Emry's testimony, the Court concludes that Mr. Dady's testimony was not significant.  Accordingly, the Petitioner has failed to establish prosecutorial misconduct in connection with Mr. Dady's testimony.  As Petitioner has failed to establish prosecutorial misconduct regarding Mr. Dady, he was not prejudiced by trial counsel's failure to raise such a claim. See, e.g., Ludwig v. United States, 162 F.3d at 458 (Counsel is not

required to raise meritless arguments to avoid a charge of ineffective assistance of counsel).[12]

In his original Motion To Vacate (Docket No. 1), Petitioner also claimed that trial counsel should have complained of an incident of prosecutorial misconduct involving $200,000 in cash that went missing from the safe at his business at a time when the Government had possession of the keys, and Alva Lock's theft of $500,000 worth of equipment and vehicles from Petitioner's business after Petitioner's arrest. The Petitioner has not provided any factual or legal support for these claims, and the Court concludes that they are without merit.

D. <u>Prosecutorial Misconduct</u>

The Petitioner claims that AUSA Koshy engaged in prosecutorial misconduct by: (1) intimidating and threatening grand jury witness Anthony Coppolla; (2) threatening trial witnesses Richard Dady and Blainey Zachary; (3) advancing the perjured testimony of Alva Lock; (4) intimidating and threatening Petitioner's wife, Vicki Kimball; and (5) expressing hostility to the Petitioner making it impossible for him to successfully cooperate.

With regard to Anthony Coppolla, the only factual support cited by Petitioner is Mr. Coppola's testimony at trial, under cross examination by Petitioner's trial counsel, in which Mr. Coppolla explains why his story to the grand jury changed over time:

Q. But eventually you did say it that day?

A. Yes, I remember telling them that, 240, hundred twenty and hundred twenty, the payments. I didn't - - I told them that because I was under pressure, that's all.

_____

[12] For similar reasons, the Court concludes that Petitioner has not established that he was prejudiced by any failure of trial counsel to advance prosecutorial misconduct claims during the cross examination of Mr. Zachary or Mr. Dady. Even if counsel had been presented with evidence supporting their allegations about Mr. Koshy, exploring those allegations on cross examination or otherwise would have yielded little assistance to Petitioner's defense in light of the insignificance of the trial testimony given by Mr. Zachary and Mr. Dady.

Q.  Under pressure?

A.  Well I mean pressure was, you know, I was scared, you know, I'm going to lose my kids, my family.

Q.  Who told you you're going to lose your kids or your family?

A.  What would you do? Wouldn't you lose your kids or your family if they put your butt in jail? That's what my concern was.  I was worried.

Q.  Now it wasn't until - -

A.  I don't want to go to jail.  I want to see my kids grow, with me.

Q.  Well, now, Mr. Koshy was threatening to send you to jail?

A.  No. No. But nobody - - he just read me the law, what the law says.  He says if you lie to the grand jury, he says what you call, 15 years or ten years, I don't remember it.  He said something like that.

Q.  Now - -

A.  I mean - - wouldn't you be scared if I tell you you're going to go to penitentiary and jail?  You would too. That's what I'm saying. I was just scared.

(Trial Transcript, at 897 (Docket No. 554 in Case No. 3:02-00053)).  Mr. Coppolla also testified that the Petitioner had asked him to lie to the grand jury. (Id., at 869-80, 900).

This testimony does not indicate that Mr. Koshy pressured Mr. Coppolla into giving false testimony to the grand jury and at trial. See Akrawi v. Booker, 572 F.3d at 265.  Rather, it shows that Mr. Coppolla decided to eventually tell the truth because he feared a perjury prosecution. According to Mr. Coppolla, it was the Petitioner who asked him to testify falsely.  In addition, the Petitioner has not otherwise established a due process violation for intimidation of potential defense witnesses under the case law set forth above. Accordingly, the Court concludes that the prosecutorial misconduct claim regarding Mr. Coppolla is without merit.

With regard to Alva Lock, the Petitioner points to the testimony of DEA Special Agent

Benny Goodman at the sentencing hearing in which Agent Goodman states that Mr. Lock initially denied knowing anything about drug trafficking, but later admitted that he did. (Sentencing Transcript, at 22-25 (Docket No. 595)). Mr. Lock's failure to tell the truth in his initial statements to law enforcement, however, does not prove that Mr. Lock gave false testimony at trial. Moreover, calling a witness to testify who has lied in the past does not constitute the knowing advancement of perjured testimony. Accordingly, Petitioner has failed to show prosecutorial misconduct regarding Mr. Lock's testimony.[13]

With regard to the claims involving Blainey Zachary and Richard Dady, the Petitioner has not established prosecutorial misconduct for the reasons set forth above.

Also, as discussed above, Petitioner has not established that any hostility expressed by Mr. Koshy towards him, or threats to arrest Vicki Kimball, rose to the level of a prosecutorial misconduct claim.

IV. Conclusion

For the reasons set forth herein, the Court concludes that Petitioner is not entitled to relief under 28 U.S.C. § 2255. Therefore, the Petitioner's Motion Under § 2255 is denied, and this action is dismissed.

Should the Petitioner give timely notice of an appeal from this Memorandum and Order,

_____

[13]   Although not raised in his Motion To Vacate (Docket No. 1), the Petitioner states in his affidavit that he received a letter in March, 2008 from Jack E. Howton, who claims to have been a former inmate housed with trial witness Engles Owens. Mr. Howton said Mr. Owens told him that he tailored his testimony based on conversations with "Al Lot" and that the U.S. Attorney and investigators put Mr. Owens "in a room with others so they all could get there (sic) story right." (Docket No. 39-1, at p. 17 of 18). To the extent the Petitioner is raising this claim, the Court finds it to be without merit as such unsworn hearsay statements are insufficient to support a prosecutorial misconduct claim.

43

such notice shall be treated as a application for a certificate of appealability, 28 U.S.C. 2253(c), which will not issue because the Petitioner has failed to make a substantial showing of the denial of a constitutional right. <u>Castro v. United States</u>, 310 F.3d 900 (6th Cir. 2002).

    It is so ORDERED.

_Todd Campbell_

TODD J. CAMPBELL<br>
UNITED STATES DISTRICT JUDGE
